# STATE OF MICHIGAN

# COURT OF APPEALS

MARJORIE LEBENBOM,

        Plaintiff-Appellee,

v

UBS FINANCIAL SERVICES, INC.,

        Defendant-Appellant.

FOR PUBLICATION
October 23, 2018
9:05 a.m.

No. 340973
Oakland Circuit Court
LC No. 2017-158957-CZ

Before: O'BRIEN, P.J., and K. F. KELLY and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals as of right the trial court's order denying its motion for summary disposition sought pursuant to MCR 2.116(C)(7), or in the alternative, to compel arbitration pursuant to MCR 3.602. We reverse and remand for proceedings consistent with this opinion.

## I. FACTS

This appeal follows defendant's alleged action of erroneously removing funds from plaintiff's brokerage account in July 2016. The facts in this case are largely undisputed. In a two-count complaint filed May 26, 2017, plaintiff alleged statutory conversion and common law conversion against defendant. According to the allegations in the complaint, plaintiff created a revocable trust on November 2, 1979 and the trust opened an account with defendant at its location in Birmingham, Michigan. On July 5, 2016, defendant received a "[t]ax [c]ompliance [l]evy" from the New York State Department of Tax and Finance[.]" The judgment debtor listed on the levy was plaintiff's husband, Milton Lebenbom. According to plaintiff, "[i]n response to this facially defective levy, defendant completely restricted [plaintiff's] access to all of the funds" in her account. Plaintiff's counsel contacted defendant on July 13, 2016, requesting that defendant release "the unlawful restriction" on the funds as the funds had been incorrectly frozen. Plaintiff further alleged that from July 5, 2016, until September 29, 2016, she did not have access to the funds in her account and that defendant did not provide any information with respect to when the hold on the account would be released. As a result, during that time period, plaintiff was left without monetary resources to pay her utility bills or other monthly expenses. Plaintiff stated that defendant had received another levy from the New York State Department of Tax and Finance in February 2011, and after freezing plaintiff's assets at that time, "[UBS] expeditiously released her funds after determining that the levy was intended [for plaintiff's husband]." According to the complaint, defendant had in fact received multiple levies identical

-1-

to that received in July 2016, but each time had released the funds in plaintiff's account after it was determined that the levies were directed to plaintiff's husband. On July 29, 2016, defendant allegedly removed $156,130.222 from plaintiff's account, an amount that doubled the amount of the tax levy, and did so without plaintiff's written authorization. Finally, on September 28, 2016, after the New York State Department of Tax and Finance concluded that the levy could not attach to assets held in plaintiff's name, the levy was released.

After plaintiff filed her complaint, in lieu of filing an answer, defendant filed a motion for summary disposition pursuant to MCR 2.116(C)(7). In the alternative, defendant sought an order from the trial court compelling arbitration pursuant to MCR 3.602. In its brief in support, defendant argued that summary disposition was appropriate where, on July 20, 2004, plaintiff signed an Account Services Selection form which contained an arbitration agreement. Accordingly, defendant claimed that summary disposition should be granted because of the parties' agreement to arbitrate. In support of its motion, defendant included the Account Services Selection form that plaintiff signed on July 20, 2004. In the portion of the form captioned "Client Agreement[,]" the following language regarding arbitration is included:

**BY SIGNING BELOW ACCOUNT HOLDER UNDERSTANDS[,] ACKNOWLEDGES AND AGREES:**

**\* \* \***

**that in accordance with the last paragraph of the Master Account Agreement entitled "Arbitration" the Account Holder agrees in advance to arbitrate any controversies which may arise with[,] among others[,] UBS Financial Services in accordance with the terms outlined therein.**[1]

The Master Account Agreement (MAA) provides the following with respect to arbitration:

**Arbitration**

**Arbitration is final and binding on the parties.**

**The parties are waiving their right to seek remedies in court, including the right to jury trial.**

**Pre-arbitration discovery is generally more limited than and different from court proceedings.**

---

[1] The Client Agreement portion of the Account Services Selection form also provides that plaintiff "has received and read a copy of this Client Agreement and attached [Master Account Agreement] (which contains a copy of this Paragraph for Account Holder reference) and agree[s] to be bound by the terms and conditions contained therein (which terms and conditions are hereby incorporated by reference)."

**The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.**

**The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

**Client agrees, and by carrying an account for Client UBS Financial Services agrees that, any and all controversies which may arise between UBS Financial Services, any of UBS Financial Services' employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this Agreement or any other agreement, whether entered into prior to, on or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this Agreement shall be held under and pursuant to and be governed by the Federal Arbitration Act, and shall be conducted by an arbitration panel convened by the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. Client may also select any other national securities exchange's arbitration forum in which UBS Financial Services is legally required to arbitrate the controversy with Client, including, where applicable, the Municipal Securities Rulemaking Board. Such arbitration shall be governed by the rules of the organization convening the panel. Client may elect in the first instance the arbitration forum, but if Client fails to make such election by certified mail, return receipt requested, or telegram addressed to UBS Financial Services at its main office, and to the attention of the Legal Department, before the expiration of five (5) days after receipt of a written request from UBS Financial Services to make such election then UBS Financial Services may make such election. The award of the arbitrators, or the majority of them, shall be final, and judgment on the award rendered may be entered in any court of competent jurisdiction.**

In her response to the motion, plaintiff claimed that FINRA,[2] where the claims would be arbitrated, did not have authority to arbitrate her claims and that the arbitration clause did not encompass her claims alleging wrongful conversion against defendant. Plaintiff also asserted that the terms of the arbitration clause were ambiguous. In its reply brief, defendant maintained that arbitration was required by FINRA, and that plaintiff's claims fell within the confines of the arbitration clause. After conducting a hearing on defendant's motion, the trial court denied the motion. Defendant now appeals as of right.

## II. SCOPE OF THE ARBITRATION AGREEMENT

Defendant first argues that the trial court erred in determining that the parties' arbitration clause does not encompass plaintiff's claims alleging conversion against defendant. We agree.

---

[2] FINRA is an acronym for the Financial Industry Regulatory Authority.

## A. STANDARD OF REVIEW

In *Galea v FCA US, LLC*, 323 Mich App 360, 368; ___ NW2d ___ (2018), this Court recently set forth the standard of review for a motion for summary disposition brought pursuant to MCR 2.116(C)(7):

> We review de novo a trial court's decision to grant or deny a motion for summary disposition under MCR 2.116(C)(7). *Hicks v EPI Printers, Inc*, 267 Mich App 79, 84; 702 NW2d 883 (2005). A motion under MCR 2.116(C)(7) is appropriately granted when a claim is barred by an agreement to arbitrate. *Maiden v Rozwood*, 461 Mich 109, 118-119 n 3; 597 NW2d 817 (1999). "A party may support a motion under MCR 2.116(C)(7) by affidavits, depositions, admissions, or other documentary evidence." *Id*. at 119. However, "a movant under MCR 2.116(C)(7) is not required to file supportive material, and the opposing party need not reply with supportive material. The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Id*. Whether an arbitration agreement exists and is enforceable is a legal question that we review de novo. *Hicks*, 267 Mich App at 84.

Questions regarding the interpretation of contractual language are viewed de novo. *VHS Huron Valley Sinai Hosp v Sentinel Ins Co*, 322 Mich App 707, 715; 916 NW2d 218 (2018).

## B. ANALYSIS

The pivotal issue to be resolved in this appeal is whether the arbitration clause in the parties' MAA encompasses plaintiff's claims against defendant to the extent that plaintiff's claims are barred by the agreement to arbitrate. As an initial matter, the parties do not dispute that this case is governed by the Federal Arbitration Act (FAA), 9 USC 1 *et seq*. State courts are mandated, pursuant to the Supremacy Clause of the United States Constitution, US Const, art VI, cl 2, to adhere to the FAA's substantive provisions. *Abela v Gen Motors Corp*, 257 Mich App 513, 524; 669 NW2d 271 (2003), aff'd 469 Mich 603 (2004).

In *Amtower v William C Roney & Co* (*On Remand*), 232 Mich App 226, 234; 590 NW2d 580 (1999), this Court, citing precedent from the United States Supreme Court,[3] recognized that when determining "whether the parties agreed to arbitrate a certain matter, courts should ordinarily apply basic-state law principles that govern the formation of contracts."

> " 'The cardinal rule in the interpretation of contracts is *to ascertain the intention of the parties*.' " *Goodwin, Inc v Coe Pontiac*, 392 Mich 195, 209; 220 NW2d 664 (1974), quoting *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924) (emphasis in *Goodwin*). "Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain

_____

[3] The *Amtower* Court cited *First Options of Chicago, Inc v Kaplan*, 514 US 938, 944; 115 S Ct 1920; 131 L Ed 2d 985 (1995).

sense and meaning." *Haywood v Fowler*, 190 Mich App 253, 258; 475 NW2d 458 (1991). [*Amtower* (*On Remand*), 232 Mich App at 234 (emphasis in original).]

Recognizing the "strong federal policy promoting arbitration," the *Amtower* Court instructed that where an ambiguity may exist with regard to whether a specific matter "falls within the scope of arbitration," such ambiguity is to be resolved in favor of submitting the matter to the arbitrator. *Id*. at 234. Viewed against the backdrop of the presumption that a dispute should be subject to arbitration, "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute'" doubts regarding whether a dispute is arbitrable are "resolved in favor of coverage." *Amtower* (*On Remand*), 232 Mich App at 235, quoting *AT & T Technologies, Inc v Communications Workers of America*, 475 US 643, 650; 106 S Ct 1415; 89 L Ed 2d 648 (1986).

More recently, this Court has highlighted that arbitration presents a contractual matter between the parties, and that parties will not be required to arbitrate matters that they did not agree to submit to an arbitrator. Specifically, in *Bienenstock & Assoc, Inc v Lowry*, 314 Mich App 508, 515; 887 NW2d 237 (2016), this Court stated, in pertinent part, as follows:

> "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc v Kaplan*, 514 US 938, 943; 115 S Ct 1920; 131 L Ed 2d 985 (1995). In other words, " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *Howsam v Dean Witter Reynolds, Inc*, 537 US 79, 83; 123 S Ct 588; 154 L Ed 2d 491 (2002), quoting *United Steelworkers of America v Warrior & Gulf Navigation Co*, 363 US 574, 582; 80 S Ct 1347; 4 L Ed 2d 1409 (1960). "In this endeavor, as with any other contract, the parties' intentions control." *Stolt–Nielsen SA v AnimalFeeds Int'l Corp*, 559 US 662, 682; 130 S Ct 1758; 176 L Ed 2d 605 (2010) (quotation marks and citations omitted).

Likewise, the Michigan Supreme Court has recognized that the party seeking to avoid the arbitration agreement bears the burden of establishing that his or her claims fall outside the ambit of the arbitration agreement. *Altobelli v Hartmann*, 499 Mich 284, 295; 884 NW2d 537 (2016). Moreover, when deciphering whether plaintiff's claims are covered by the parties' arbitration clause, this Court is not permitted to analyze "the substantive merits" of plaintiff's claims. *Id*. at 296. Rather, if the dispute is subject to arbitration, such matters are left to the arbitrator to decide. *Id*.

As we undertake an analysis of whether plaintiff's claims are subject to arbitration, we must review the arbitration clause, and determine "whether the *subject matter* of the instant dispute is covered by the arbitration clause." *Id*. For the answer to this question, we must first turn to the plain language of the arbitration agreement. *Id*. at 299. Notably, the Michigan Supreme Court has articulated that a reviewing Court must "look beyond the mere procedural labels to determine the exact nature of the claim[ ]" to avoid "artful pleading." *Id*. at 299-300. If plaintiff's claims can be characterized as "arguably" falling with the confines of the arbitration

clause, any doubts are resolved in favor of arbitration, and the trial court should have granted defendant's motion to compel arbitration. *DeCaminada v Coopers & Lybrand, LLP*, 232 Mich App 492, 500; 591 NW2d 364 (1999).

As set forth above, the parties' arbitration agreement provides, in pertinent part, as follows:

> **Client agrees, and by carrying an account for Client UBS Financial Services agrees that, any and all controversies which may arise between UBS Financial Services, any of UBS Financial Services' employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this Agreement or any other agreement, whether entered into prior to, on or subsequent to the date hereof, shall be determined by arbitration.**

## C. DICTIONARY DEFINITIONS

On appeal, plaintiff, pointing to the definition of "account" from Black's Law Dictionary (7th ed) defining account as involving "[a] course of business dealings or other relations for which records must be kept[,]" argues that her claims of wrongful conversion are not subject to arbitration because the parties' business relationship is not implicated. Turning to the definition of "property" set forth in the MAA, plaintiff also contends that any disputes that arose between plaintiff and defendant involved "property" as opposed to her account.[4] Plaintiff also claims that her allegations do not implicate a "transaction" as set forth in the arbitration clause, because a transaction, as defined by *Merriam Webster's Online Dictionary*, is "an exchange or transfer of goods, services or funds" or the "act or process of doing business with another person." In a subtle nuance to this argument, plaintiff contends that a "transaction" did not occur where she is not alleging that defendant "exchange[d] or transfer[ed] . . . funds" between itself or plaintiff or the New York State Department of Tax and Finance. In her final argument with regard to the undefined terms in the arbitration clause, plaintiff asserts that (1) any dispute subject to arbitration is limited to such matters that contest the subject matter of the MAA itself and (2) that the arbitration clause's use of the word "dispute" is redundant where both "dispute" and "controversies" have the same meaning. While plaintiff's arguments that the arbitration clause's terms do not evince an intention by the parties to subject plaintiff's claims to arbitration are novel and creative, they are not supported by a review of the plain language of the contract.

---

[4] The MAA defines property in the following manner:

> "Property" includes, but is not limited to, securities, money, stocks, options, bonds, notes, futures contracts, commodities, commercial paper, certificates of deposit and other obligations, contracts, all other property usually and customarily dealt in by brokerage firms and any other property that can be recorded in any of Client's accounts with UBS Financial Services.

As a preliminary matter, as both parties acknowledge on appeal, the MAA does not provide any guidance with respect to what issues may constitute "controversies" as set forth in the agreement. In an effort to determine the plain and ordinary meaning of words used in a contract, this Court may refer to dictionary definitions. *Auto Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015). *Merriam-Webster's Collegiate Dictionary* (11th ed) defines a "controversy" as a "discussion marked especially by the expression of opposing views[.]" The *New Oxford American Dictionary* (3rd ed) similarly defines "controversy" as "a disagreement, typically when prolonged, public and heated[.]" Moreover, *Merriam Webster's Collegiate Dictionary* (11th ed) defines a "dispute" as "to engage in argument[,]" "to call into question[,]" "to contend over[.]" The *New Oxford American Dictionary* (3rd ed) defines dispute as "a disagreement, argument or debate[.]" Likewise, *Merriam Webster's Collegiate Dictionary* (11th ed) defines a "transaction" as "something transacted[,]" and elaborates that it is the "exchange or transfer of goods, services or funds[,]" or "an act, process, instance of transacting[.]" The *New Oxford American Dictionary* (3rd ed) defines "transaction" as "the action of conducting business." Finally, *Merriam Webster's Collegiate Dictionary* (11th ed) defines an account as "a record of debit and credit entries to cover transactions involving a particular item or a particular person or concern[.]" The *New Oxford American Dictionary* (3rd ed) defines an account as "a report or description of an event or experience[.]"

After reviewing these dictionary definitions of "controversies," "account[,]" "transaction[,]" and "dispute[,]" it is evident to us that plaintiff's allegations in her complaint present claims that should be arbitrated. For example, there is a controversy with respect to transactions relating to plaintiff's brokerage account where the thrust of her allegations in her complaint pertain to defendant's handling of the funds in her account. More specifically, where plaintiff is alleging that defendant wrongfully froze and withheld funds held in her brokerage account from her after receiving the tax levy, and transferred a portion of those funds to another account, these allegations certainly present a disagreement between the parties with respect to whether defendant's actions were lawful and warranted. Put another way, both parties hold strong opposing views on the subject of defendant's actions with regard to plaintiff's account and disagree with respect to whether defendant's actions were lawful and appropriate, particularly with regard to whether defendant ought to have taken such action when the name of plaintiff's husband, as opposed to plaintiff herself, was included on the tax levy. Accordingly, where the plain language of the arbitration agreement is clear concerning the issue of what matters are subject to arbitration, it is not open to question whether plaintiff's claims should be arbitrated. Put simply, interpreting the arbitration clause in a broad manner that effectuates the presumption in favor of arbitration, *DeCaminada*, 232 Mich App at 499,[5] plaintiff's claims alleging wrongful conversion against defendant specifically present "controversies . . . which may arise between [defendant] . . . and [plaintiff] concerning any account, transaction, [or] dispute . . . ." Our

---

[5] In *DeCaminada*, this Court expressly declined to adopt a "very narrow reading" of the arbitration clause at issue where to do so would undermine the presumption in favor of arbitration. *DeCaminada*, 232 Mich App at 499. See also *Amtower* (*On Remand*), 232 Mich App at 233 n 5 (observing that "arbitration clauses are to be liberally construed with any doubts to be resolved in favor of arbitration.")

conclusion that plaintiff's claims are subject to arbitration according to the plain terms of the contract is buttressed by the fact that the parties' contract does not provide "positive assurances" that the arbitration clause would not cover claims of wrongful conversion in the nature of what plaintiff is alleging in the present appeal. *AFSCME v Hamtramck Housing Com'n*, 290 Mich App 672, 675; 804 NW2d 120 (2010).[6]

## D. AMBIGUITY

To the extent that plaintiff argues that the arbitration clause's terms are ambiguous, this argument is also not persuasive.[7] Contractual terms can only be characterized as ambiguous if "equally susceptible to more than a single meaning[,]" or if in irreconcilable conflict with other provisions of the contract. *Barton-Spencer v Farm Bureau Life Ins Co of Mich*, 500 Mich 32, 40 n 18; 892 NW2d 794 (2017). As this Court recently observed in *Magley III v M & W, Incorporated,* ___ Mich App ___, ____; ___ NW2d ___ (2018) (Docket No. 340507); slip op at 5, this Court must read the contract as a whole and the words in the contract are to be understood in context. "Courts must give effect to every word, clause, and phrase, and a construction should be avoided that would render any part of the contract surplusage or nugatory." *Id*. (citation and quotation marks omitted.) An unambiguous contract is to be enforced as written, and the mere fact that contractual terms are "[i]nartfully worded or clumsily arranged" will not necessarily lead to a finding that a contract is ambiguous "if it fairly admits of one interpretation." *Id*. (citation and quotation marks omitted.)

In the present case, the contractual terms at issue in the arbitration clause of the MAA are not equally susceptible to more than one meaning, and the contractual terms are not in irreconcilable conflict with each other. *Barton-Spencer*, 500 Mich at 40 n 18. Instead, a review of the MAA, read as a whole and affording the words used in the contract a contextual understanding, reflects that the parties, by entering into the agreement, did agree that any and all controversies that arose between plaintiff and defendant concerning any account, dispute or transaction would be submitted to and decided by arbitration. Under these circumstances, plaintiff's allegation that the contractual terms are ambiguous is unavailing.

---

[6] Other panels of this Court have found similarly broadly worded arbitration clauses to encompass the parties' claims. See, e.g, *DeCaminada*, 232 Mich App at 499 (concluding the plaintiff's claims of age discrimination and conversion were encompassed by an arbitration clause requiring the parties to arbitrate claims "arising out of . . . the practice, business or affairs of [the defendant]. . . ."); *Amtower* (*On Remand*), 232 Mich App at 236 (concluding that a broadly worded arbitration clause, "covering . . . *any* controversy arising between the parties" reflects that the arbitration was to decide any issues concerning the timeliness of the plaintiff's claims).

[7] In her brief on appeal, plaintiff does not fully develop a legal argument with respect to why she asserts that the contractual terms are ambiguous, but instead urges this Court to remand this case to the trial court for discovery and a separate trial to determine (1) the circumstances regarding plaintiff's execution of the Account Services Selection form and (2) whether plaintiff intended to submit potential conversion claims to arbitration.

## E. UNCONSCIONABILITY

Plaintiff also argues on appeal that the arbitration clause is invalid where it is unconscionable. To the extent this issue was not squarely raised before, and decided by, the trial court, it is not preserved for appellate review. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). However, this Court may address unpreserved issues where the question presented is one of law and the facts necessary to the resolution of the issue have been presented. *Elahham v Al-Jabban*, 319 Mich App 112, 120; 899 NW2d 768 (2017). In *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 143-144; 706 NW2d 471 (2005), this Court set forth the governing legal principles in determining whether a contract is procedurally and substantively unconscionable:

> In order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be present. Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. Substantive unconscionability exists where the challenged term is not substantively reasonable. However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience. [*Id*. at 143-144 (citations omitted).]

As an initial matter, addressing first the component of substantive unconscionability, there is nothing in the language of the arbitration clause that can be construed as "inherently unreasonable[ ]" or such that it "shocks the conscience[.]" *Id*. at 144. Instead, the arbitration clause contains a mandatory arbitration provision for all controversies arising between the parties. While plaintiff may be now displeased with the fact that she agreed to this provision by signing the Account Selection Services form, there is nothing in the plain language of the arbitration clause that leads us to conclude that it is so "extreme" that it can be said to be substantively unconscionable. *Id*. Under such circumstances, while the plain language of the arbitration clause is not advantageous to plaintiff, her argument that the arbitration clause is substantively unconscionable is unavailing. See *Vittiglio v Vittiglio*, 297 Mich App 391, 404; 824 NW2d 591 (2012) (recognizing that even though a contract is disadvantageous to a party, this will not result in a finding of substantive unconscionability).

Turning to procedural unconscionability, such a circumstance exists "where the weaker party had no realistic alternative to acceptance of the [disputed] term." *Liparoto Const, Inc v Gen Shale Brick, In*c, 284 Mich App 25, 30; 772 NW2d 801 (2009). While there is evidence in the record, in the form of plaintiff's September 5, 2017 affidavit, that she was presented with a form by defendant's employees that she thought was a form to complete for free checks, and that she was not informed about the arbitration clause or asked to consent to its inclusion in her brokerage agreement with defendant, Michigan law is clear that a party who signs an agreement, "in the absence of coercion, mistake, or fraud, is presumed to know the nature of the document and to understand its contents." *Clark*, 268 Mich App at 144. Additionally, while plaintiff is a sympathetic figure because of her advanced age, there is nothing in the record to suggest that

she, as the weaker party in this dispute, "had no realistic alternative to acceptance of the [disputed] term[s]." *Liparoto*, 284 Mich App at 30.

## III. AUTHORITY OF FINRA

Defendant next argues that the trial court erred in determining that FINRA did not have authority to arbitrate plaintiff's claims. We agree.

In the trial court, plaintiff argued that FINRA did not have authority to arbitrate plaintiff's claims where the requirements of § 12220 of the FINRA Code of Arbitration were not satisfied. This rule provides:

Parties must arbitrate a dispute under the Code if:

Arbitration under the Code is either

(1) Required by a written agreement, or

(2) Requested by the customer;

The dispute is between a customer and a member or associated person of a member, and

The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company. [FINRA Code, § 12200.]

Before we can properly decide the issue whether the trial court correctly concluded that FINRA cannot arbitrate plaintiff's claims where the requirements of FINRA Code of Arbitration § 12200 were not met, we must first determine whether this was even a question that the trial court could decide. Notably, while plaintiff and defendant hotly contest whether FINRA has the authority to consider and arbitrate plaintiff's claims against defendant, neither party has addressed the important, and preliminary issue, that being whether the trial court could decide the question of FINRA's authority to arbitrate the dispute. In *Bienenstock*, this Court, citing the United States Supreme Court's decision in *Howsam*, 537 US at 79, recognized that a court's authority to determine questions related to the parties' agreement to arbitrate is limited, and only extends to "threshold" or "gateway" questions related to arbitration. *Bienenstock*, 314 Mich App at 515-516. For example, such "gateway questions" reserved to the courts have been held to include the initial inquiry of whether the parties even agreed to arbitrate. *Id.* at 516.

Examples of gateway or arbitrability issues "include questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.' " [*BG Group, PLC v Republic of Argentina*, 572 US 25, 28-29; 134 S Ct 1198, 1206; 188 L Ed 2d 220 (2014)], quoting *Howsam*, 537 US at 84. [*Bienenstock*, 314 Mich App at 516.]

In contrast, procedural matters that arise out of the dispute and are relevant to its final disposition are considered subsidiary issues that are reserved to the arbitrator, unless there is language in the contract reflecting that the arbitrator is not to decide these issues. *Id.*

> In other words, "the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *BG Group*, 572 US at ___, 134 S Ct at 1207. Examples of procedural questions for the arbitrator to decide include "whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration," and "allegation[s] of waiver, delay, or a like defense to arbitrability." *Howsam*, 537 US at 84 (quotation marks and citations omitted; alteration in original). When the issue presented is close and "there is doubt" about whether an issue is a gateway question for the court or a procedural one for the arbitrator, "we should resolve that doubt in favor of arbitration." *Green Tree Financial Corp v Bazzle*, 539 US 444, 452; 123 S Ct 2402; 156 L Ed 2d 414 (2003) (plurality decision; opinion by BREYER, J.) (quotation marks omitted), citing *Mitsubishi Motors Corp v Soler Chrysler–Plymouth, Inc*, 473 US 614, 626; 105 S Ct 3346; 87 L Ed 2d 444 (1985). [*Bienenstock*, 314 Mich App at 516-517.]

In *Howsam*, the United States Supreme Court was asked to consider an arbitration rule of the National Association of Securities Dealers (NASD). *Howsam*, 537 US at 81. The rule at issue provided that a dispute was not eligible for arbitration after six years had elapsed from the occurrence or event giving rise to the dispute. *Id.* In determining whether a court or an arbitrator should decide the issue, the United States Supreme Court ruled that the issue was reserved to the arbitrator. *Id.* The *Howsam* Court provided beneficial guidance with respect to deciphering between what constitutes a gateway question of arbitrability for the courts to decide as opposed to procedural issues that ought to be left to the arbitrator. *Id.* at 83-84. In setting forth principles regarding what constitutes a question of arbitrability, the *Howsam* Court ruled, in pertinent part, as follows:

> Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See [*First Options of Chicago*, 514 US at 942]. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate. [*Howsam*, 537 US at 83-84.]

In contrast, questions of arbitrability do not arise in circumstances where "parties would likely expect that an arbitrator would decide the question[.]" *Id.* at 84. Such matters are those that arise out of the dispute and bear on its ultimate disposition. *Id.* In so ruling, the *Howsam* Court observed that the Revised Uniform Arbitration Act of 2000 encompassed the holdings of

state courts and the law developed pursuant to the FAA, and specified that arbitrators should decide whether a condition precedent to submitting a matter to arbitration has been completed. *Id*. at 85. Concluding that the issue of the NASD time limit "falls within the class of gateway procedural disputes" that do not implicate questions of arbitrability and should be left to the arbitrator, the *Howsam* Court ruled, in pertinent part:

> Moreover, the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. Cf. *First Options*, 514 US at 944-945. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy-a goal of arbitration systems and judicial systems alike. [*Howsam*, 537 US at 85.]

In *Granite Rock Co v Int'l Brotherhood of Teamsters*, 561 US 287, 295; 130 S Ct 2847; 177 L Ed 2d 567 (2010), the United States Supreme Court articulated that "where the dispute at issue concerns contract formation, the dispute is generally for the courts to decide." Specifically, the *Granite Rock Co* Court stated:

> These unusual facts[8] require us to reemphasize the proper framework for deciding when disputes are arbitrable under our precedents. Under that framework, a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute. See *First Options, supra*, at 943; *AT & T Technologies, supra*, at 648–649. To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce. See, e.g., *Rent-A-Center, West, Inc v. Jackson*, ___U.S. ___, ___-___, 130 S Ct 2772, ___ L Ed 2d ___ (2010) (opinion of SCALIA J.). Where there is no provision validly committing them to an arbitrator, see ante, at 2776 – 2778, these issues typically concern the scope of the arbitration clause and its enforceability. In addition, these issues always include whether the clause was agreed to, and may include when that agreement was formed. [Footnote added.]

More recently, in *BG Group, PLC*, 572 US at 28-29, the United States Supreme Court considered whether interpretation of a contractual provision regarding arbitration in a treaty between the United Kingdom and Argentina presented a substantive gateway issue for the courts to determine or a procedural matter best reserved to the arbitrator.[9] Noting that the "text and

---

[8] *Granite Rock Co* involved a question concerning the ratification of a collective bargaining agreement. *Granite Rock Co*, 561 US at 297.

[9] The provision at issue provided for arbitration

structure of the provision make clear that it operates as a procedural condition precedent to arbitration[,]" the Court recognized that the provision "determines *when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all." *Id*. at 35. The *BG Group, PLC* Court further explained why the rule was a matter of procedure, characterizing it as "a claims-processing rule that governs when the arbitration may begin, but not whether it may occur or what its substantive outcome will be on the issues in dispute." *Id*. at 35-36. Where the treaty between the parties did not indicate that the "provision is to operate as a substantive condition on the formation of the arbitration contract, or that it is a matter of such elevated importance that it is to be decided by the courts[,]" the United States Supreme Court concluded that the interpretation and application of the provision was best left to the arbitrators. *Id*. at 40-41. Importantly, the *BG Group, PLC* Court expressly recognized that "[i]nternational arbitrators are likely more familiar than are judges with the expectations of foreign investors and recipient nations regarding the operation of the provision." *Id*. at 40.

Turning to Michigan precedent, our research has not yielded a published case in which this Court or the Michigan Supreme Court has specifically decided the issue whether the trial court or the arbitrator has the authority to determine if the requirements of § 12200 are met. In *Bienenstock*, where this Court undertook a thorough review of the distinction between gateway issues for the Court and procedural issues for the arbitrator, the question on appeal was whether "a trial court judge or an arbitrator is the appropriate one to decide whether multiple arbitrations should be consolidated when the contract does not speak to the issue." *Bienenstock*, 314 Mich App at 514, 515-516. See also *Gregory J Schwartz & Co, Inc v Fagan*, 255 Mich App 229, 232; 600 NW2d 103 (2003) (citing *Howsam* and recognizing that arbitrators are in a better position of expertise to interpret the meaning of their own rules).

However, having considered the United States Supreme Court precedent, we conclude that whether the dispute between plaintiff and defendant can be arbitrated pursuant to § 12200 is a question to be determined in the FINRA arbitration proceedings. Specifically, where the parties disagree regarding whether (1) the existence of a written agreement settles the question of whether the dispute should be arbitrated pursuant to § 12200 and (2) the dispute arises in connection with defendant's "business activities[,]" as set forth in § 12200, this Court has instructed that if there is a doubt concerning whether a matter presents a gateway issue or a procedural question, any doubt is resolved in favor of arbitration. *Bienenstock*, 314 Mich App at 516-517. Moreover, the interpretation of whether the requirements of § 12200 have been satisfied does not fall within "the . . . limited scope" of a question of arbitrability, and the present case does not present "narrow circumstance[s]" where the parties would likely have expected a court to decide this matter. *Howsam*, 537 US at 83. This is particularly so where the MAA is so

_____

(i) where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal . . . , the tribunal has not given its final decision; [or]

(ii) where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute. [*BG Group, PLC*, 572 US at 28.]

broadly worded to include "any controversies" that arise between the parties within its ambit. Additionally, where the parties' contract reflects their agreement to arbitrate all controversies arising between them, the risk of forcing the parties to arbitrate a dispute that they did not agree to arbitrate is simply not present in this case. *Id*. at 83-84. Also, the requirement that the parties establish that the dispute arose in conjunction with defendant's business activities before submitting the matter to arbitration can be characterized as a "procedural condition precedent" to arbitration, because such an inquiry will be determinative of when the contractual duty to arbitrate arises, not whether it exists at all. *BG Group, PLC*, 572 US at 35. Similarly, as the United States Supreme Court has recognized, a FINRA arbitrator is better equipped to determine whether plaintiff and defendant's dispute arose "in connection with" defendant's business activities, and therefore this recognition of the arbitrator's expertise provides further support for the conclusion that the interpretation of § 12200 is best left to the arbitrator. *BG Group, PLC*, 572 US at 40; *Howsam*, 537 US at 85. Accordingly, to the extent the trial court determined that FINRA did not have authority to arbitrate this dispute pursuant to FINRA Code of Arbitration, § 12200, which was not a "gateway" question reserved to the trial court, this determination was erroneous and warrants reversal.

## IV. CONCLUSION

We reverse the trial court's order denying defendant's motion for summary disposition, or in the alternative to compel arbitration, and remand for entry of an order compelling the case to arbitration. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood

-14-