**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0614n.06

Case No. 18-3229

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Dec 10, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MATT A. ROGERS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| SWEPI LP, et al., | ) | OHIO |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE: SILER, MOORE, and ROGERS, Circuit Judges.

**SILER**, Circuit Judge. In October 2011, Matt A. Rogers and Shell[1] entered into a lease agreement governing extraction of oil and gas from Rogers's five-acre property located in Guernsey County, Ohio. Important to Rogers, the agreement provides a signing bonus of $5,000 per acre, contingent upon Shell's timely verification that Rogers possesses good title to the property. Important to Shell, the lease contains a broad arbitration clause, providing that any dispute under the lease be resolved by binding arbitration. Rogers has sued for breach of contract, individually and on behalf of other landowners having similar contracts with Shell, alleging that Shell failed to pay the signing bonuses.

---

[1] Appellants SWEPI LP and Shell Energy Holding GP LLC are referred to collectively as "Shell."

Currently before the panel is the district court's denial of Shell's motion to compel arbitration. Because Rogers's argument against arbitration attacks much more than the arbitration clause itself, the district court's judgment is **REVERSED** and the case is **REMANDED** to the district court for entry of an order compelling arbitration and a decision on whether the Lease allows for class-wide arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

This litigation has not yet reached the question of whether Shell's alleged failure to pay the signing bonus constitutes a breach of the contract between itself and Rogers. This appeal asks: who decides the arbitrability of the dispute and, if it is a federal court, how should it be decided? Additionally, the parties ask the Court to determine whether the lease agreement allows for class procedures in arbitration.

According to Rogers, the lease's arbitration clause did not trigger until Shell paid the signing bonus; since Shell did not pay the bonus, he argues that the arbitration clause never became effective. Shell argues that Rogers attacks much more than the arbitration clause—he attacks nearly the entire contract. Thus, the arbitration dispute should never have been decided by the district court. And even if the district court had the power to decide the arbitration dispute, the lease's broad arbitration clause compels arbitration. The district court agreed with Rogers, denying Shell's motion. Shell appeals.

The agreement between Rogers and Shell is memorialized in the "Oil and Gas Lease," a document having 41 numbered sections covering various aspects of the parties' relationship. The first line of the agreement defines the term "Lease" as the "Oil and Gas Lease." The parties proceed to use the term "Lease" repeatedly throughout the document.

Only a few of the Lease's provisions are relevant to this appeal. Section One of the Lease includes the granting clause, under which Rogers conveyed a leasehold interest to Shell for the purpose of oil and gas exploration and production. Section Eight provides that "[t]his Lease shall become effective on the date that this Lease is signed by the Lessor." Section Thirty-Three provides that, if the parties do not agree to non-binding mediation, "[a]ny dispute that arises under this Lease . . . shall be resolved by binding arbitration . . . ." It is undisputed that Rogers signed the agreement in 2011.

The signing bonus clause is contained in Section Sixteen:

> Lessee agrees to pay Lessor a signing bonus of Five Thousand Dollars ($5,000.00) for each acre contained within the Leased Premises subject to Lessee's verification of Lessor's marketable title. Lessee shall have up to one hundred twenty (120) days after the Effective Date to verify Lessor's marketable title to the Leased Premises . . . . By Lessor's signing this Lease, Lessor promises to proceed with this Lease and be bound thereby upon Lessee's paying the full amount of the bonus payment.

Finally, Section Twenty-Five of the Lease provides that, "[u]pon this Lease taking effect (thus, upon Lessor's receipt of the bonus payment), Lessee's obligations under this Lease shall not be diminished or affected by any title encumbrance on the Leased Premises . . . ."

Before the district court, Shell focused on the language of Sections Eight and Thirty-Three as a basis for compelling arbitration—arguing that the Lease constituted a single agreement, signed and executed by Rogers, and commanded that disputes under the Lease be arbitrated. Rogers relied on the language in Section Twenty-Five and the final sentence of Section Sixteen, arguing that the lease agreement was executed in stages, with his signature allowing Shell to encumber the property and verify title, and Shell's payment of the signing bonus effectuating all remaining aspects, including the arbitration clause. The district court endorsed Rogers's view:

> Plaintiff correctly describes the Lease as follows: "while the Lease became 'effective' upon Rogers' signature for purposes of allowing [Shell] to encumber the property and verify title, the last sentence of [the bonus payment clause] shows that the parties' remaining obligations (the long-term relational aspects of the Lease) did not become effective—and Rogers was not 'bound thereby'—until the signing bonus was paid." This interpretation provides meaning to the bonus payment clause and harmonizes it with the rest of the Lease.

With no evidence that Shell made the bonus payment to Rogers, the district court found that the second stage of the contract, including the arbitration clause, never took effect and denied Shell's motion to compel arbitration.

The district court failed to address the threshold issue of who decides arbitrability. It assumed it did, and then denied arbitration. But because Rogers attacks more than just the arbitration clause, an arbitrator must consider the issue first. Therefore, the district court's decision must be reversed.

## STANDARD OF REVIEW AND LEGAL STANDARD

"We review a district court's denial of a motion to compel arbitration *de novo*." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 716 (6th Cir. 2012) (internal quotation marks and citation omitted). Moreover, the proper construction of a contract is an issue of law; "therefore, this court reviews questions of contract interpretation under a *de novo* standard." *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009) (citation omitted).

The parties agree that the Federal Arbitration Act ("FAA") applies to this dispute because the contract at issue involves commerce and contains an arbitration clause. Agreements to settle controversies arising out of such contracts through arbitration, "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

**DISCUSSION**

**I.      Who decides arbitrability?**

We must decide who—an arbitrator or a federal court—should hear Rogers's defense to the arbitration provision.  The district court failed to address this threshold issue, jumping directly to the dispute itself.

Relying on *Granite Rock Co. v. International Brotherhood of Teamsters*, Rogers argues that his attack on the arbitration clause goes to its formation, and thus it was proper for the district court to decide the dispute.  *See* 561 U.S. 287, 296 (2010) ("It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." (citations omitted)).  But in this case, there is no question regarding formation (whether "the parties ever agreed to the contract in the first place").  *Teamsters Local Union 480 v. United Parcel Serv., Inc.*, 748 F.3d 281, 289 (6th Cir. 2014) (citing *Granite Rock*, 561 U.S. at 296).  Rogers does not dispute that he properly agreed to the Lease by signing it in 2011.  His attack on the arbitration provision assumes that the contract was formed; that it conferred obligations on the parties; and that Shell failed to perform one of its obligations, meaning the arbitration clause was never triggered.

Instead, Rogers's argument is an attack on the validity of the agreement to arbitrate—it asks whether the arbitration clause is legally binding.  *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010).  Generally, attacks on validity come in two varieties:  those that specifically challenge the validity of the arbitration clause, and those that challenge the validity of the contract as a whole.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-45 (2006).  "[A]ttacks on the validity of an entire contract, as distinct from attacks aimed at the

arbitration clause, are within the arbitrator's ken." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)).

Although Rogers does not attack what he deems to be the "first stage" of the Lease, his attack goes well beyond the arbitration clause. Under Rogers's two-stage lease theory, the entire second stage of the lease never became effective—a stage that both the district court and Rogers defined as "the long-term relational aspects of the Lease." The only provisions of the Lease not implicated by Rogers's attack are the bonus payment clause and those "allowing Shell to encumber the property and verify Rogers'[s] title, . . . [whereas] the parties' remaining obligations (the long-term relational aspects of the Lease) did not become effective[.]" While Rogers may care to invalidate only the arbitration clause, his own language makes it clear that his attack is much broader.[2] "[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Center, West, Inc.,* 561 U.S. at 70. The basis of the challenge must "be directed specifically to the agreement to arbitrate before the court will intervene." *Id.* at 71.

Rogers is correct that under *Granite Rock*, courts should resolve issues that call into question the "formation or applicability of the specific arbitration clause that a party seeks to have the court enforce," 561 U.S. at 297 (emphasis added), and that such issues typically concern the "enforceability" of the arbitration clause. *Id.* But as noted above, Rogers has not attacked the

---

[2] In a later section of his brief, Rogers argues that "there are no provisions other than the arbitration clause for Rogers to challenge. The *only* substantial obligation that the Lease imposed upon Rogers after his receipt of the bonus payment was the duty to arbitrate . . . ." Thus, he argues that his attack could challenge only the arbitration clause. But this argument is belied by the contradictory language used by Rogers elsewhere in his brief and before the district court. (Appellee Br. at 6) ("If the Lease moved to the second stage . . . the rest of the Lease's terms would become binding and effective and govern the parties' long-term relationship"); (Appellee Br. at 7) ("[I]mportant for purposes of this appeal, only 'upon' payment of the signing bonus would Rogers become 'bound' to the remaining provisions of the Lease—including the arbitration clause"). The district court was correct to point out that there are numerous other long-term provisions that "govern the parties' relationship with respect to royalty payments, auditing rights, liability for the impact of SWEPI's operations to plaintiff's land, and arbitration, among other things."

enforceability of the "*specific* arbitration clause." *Id.* (emphasis added). He has argued that much of the contract, which happens to include the arbitration clause, is unenforceable. Under the principles of *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* and its progeny, such attacks are for the arbitrator. *See* 388 U.S. at 403-04; *Rent-A-Center, West, Inc.,* 561 U.S. at 70-71.

Given Rogers's broad defense to arbitration, he is attacking more than just the arbitration clause. Thus, arbitrability is for the arbitrator, and the district court erred by assuming it had the power to rule on the parties' arbitration dispute.

## II.    Does the Lease authorize class procedures in arbitration?

Under the FAA, a party may not be compelled to submit to class arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original). The question of whether an arbitration agreement permits class-wide arbitration is a gateway matter, "which is reserved 'for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). An implicit agreement authorizing class action arbitration should not be inferred "solely from the fact of the parties' agreement to arbitrate." *Id.* at 600 (quoting *Stolt-Nielsen*, 559 U.S. at 685).

Here, the parties have not identified a provision in the contract that clearly and unmistakably gives the arbitrator power to decide this matter. And because the district court denied arbitration altogether, it did not rule on the class arbitration issue. The Court notes the importance of this issue to the case, given that the class could include hundreds of Ohio landowners. We decline to decide the issue on this appeal, and leave that determination for the district court to

decide in the first instance. *See Milan Express Co. v. Applied Underwriters Captive Risk Assurance Co.*, 672 F. App'x 553, 556 (6th Cir. 2016).

## CONCLUSION

The judgment of the district court is **REVERSED,** and the matter is **REMANDED** to the district court for entry of an order compelling arbitration and a decision on whether the Lease allows for class-wide arbitration.

**KAREN NELSON MOORE, Circuit Judge, dissenting in part and concurring in part.**

The question of "who decides" whether a dispute is arbitrable turns on the parties' consent. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 945 (1995). This is because "arbitration is a 'matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016) (quoting *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). In *First Options of Chicago*, the Supreme Court discussed the discrete question of "who decides" arbitrability. 514 U.S. at 942 ("[T]hey disagree about who should have the primary power to decide [the arbitrability of the dispute]. Does that power belong primarily to the arbitrators . . . or to the court . . . ?" (emphasis omitted)) The Court concluded that "[i]f . . . the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely independently." *Id.* at 943. The Court, however, emphasized that when we are deciding "who decides" arbitrability, courts must take special care—"[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944 (quoting *AT&T Techs.*, 475 U.S. at 649) (alterations in original). It is our task to consider the contract between Shell and Rogers and determine whether it clearly and unmistakably indicates that the parties intended to have an arbitrator decide whether their dispute is arbitrable. I conclude that conflicting language in the contract and the divergence between my reading of it and the majority's demonstrate that mutual consent to arbitrate arbitrability was anything but clear and unmistakable. I therefore would hold that the district court was the proper body to decide whether the dispute should be arbitrated.

Deciding this seemingly simple preliminary question requires us to consider the contract as a whole. Under the Federal Arbitration Act ("FAA"), when a court considers a motion to compel arbitration, it "must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Richmond Health*, 811 F.3d at 195 (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). We "must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce. . . . [T]hese issues always include whether the clause was agreed to, and may include when that agreement was formed." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296–97 (2010).

Under the FAA, state contract law is applied in determining whether a contract has been formed. *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007). Under Ohio law, "[t]he cardinal principle in contract interpretation is to give effect to the intent of the parties." *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 648 (Ohio 2014). In order to give effect to that intent, we "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). We consider "the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Transtar*, 16 N.E.3d at 648 (quoting *Sunoco*, 953 N.E.2d at 292).

The contract language here is hardly crystalline. It highlights two distinct events as critical for triggering rights and obligations between Rogers and Shell: signing of the agreement (which took place on October 22, 2011) and payment of the bonus (which never occurred). Article II, Section 8 provides that the "Lease shall become effective on the date that this Lease is signed by

[Rogers]." R. 1-1 (Lease) (Page ID #18). Yet in Article IV, Section 25, the contract notes that "[u]pon this Lease taking effect (thus, upon [Rogers's] receipt of the bonus payment), [Shell's] obligations under this Lease shall not be diminished . . .." R. 1-1 (Lease) (Page ID #22). Article II, Section 8 and Article IV, Section 25 therefore conflict in their assertions of when the Lease "become[s] effective" or "tak[es] effect."

Additionally, at signing the Lease, under Article III, Section 16, Rogers "promise[d] to proceed with this Lease and be bound thereby upon [Shell's] paying the full amount of the bonus payment." R. 1-1 (Lease) (Page ID #19). This clause distinguishes the onset of various of Rogers's obligations—although signing imposed on Rogers the duty to "proceed with [the] Lease," he would be "bound" by it only upon Shell's payment of the bonus. If Rogers is "bound" only upon payment of the bonus, what are his obligations prior to that? How do the two distinct dates of effectiveness interact with this clause? Finally, and particularly relevant to the dispute at hand, the contract notes in Article VII, Section 33 that "[a]ny dispute that arises under this Lease . . . shall be resolved by binding arbitration" if the parties do not resolve it through mediation. R. 1-1 (Lease) (Page ID #26). The critical question is whether, in the context of the previously discussed linguistic conflicts concerning the two triggering events, i.e. the timing of effectiveness of the contract and when Rogers was "bound" by it, the arbitration clause covers disputes arising before Shell paid Rogers the bonus. [1] And our even more discrete focus is whether the evidence is clear and unmistakable that the arbitration clause commits the question of deciding arbitrability to an arbitrator.

---

[1] Unlike some contracts, the contract at issue does not contain a discrete clause declaring specifically that an arbitrator is or is not to decide threshold questions of arbitrability. *See, e.g. Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442 (2006) (discussing a contract that specified not only that "[a]ny claim, dispute, or controversy . . . arising from or relating to this Agreement" but also that "*the validity, enforceability, or scope of this Arbitration Provision* . . . shall be resolved . . . by binding arbitration") (emphasis added).

I believe that the best reading of the contract concludes that it contemplates two distinct phases of a relationship between Rogers and Shell. In the first phase, which begins at signing, Rogers conveys the lease to Shell and Shell has 120 days to complete verification of Rogers's marketable title to the covered land. If Shell finds "to its reasonable satisfaction after its title due diligence period review that [Rogers] does not have marketable title to the Leased Premises," the lease terminates, Shell must "promptly terminate any recorded memorandum of lease it may have filed," and "no payments [are] owed by [Shell] to [Rogers]." R. 1-1 (Lease Article III, Section 16) (Page ID #19). If, however, Shell determines that Rogers does have marketable title, Shell is "to pay [Rogers] a signing bonus of Five Thousand Dollars ($5,000.00) for each acre." *Id.* Only "upon [Shell's] paying the full amount of the bonus payment" would the second phase of the Lease become effective and would Rogers be "bound" by it. *Id.* Payment of the bonus served as a condition precedent for the parties entering the second phase of the contract. Under Ohio contract law, "[a] condition precedent is a condition that must be performed before obligations in a contract become effective." *Transtar*, 16 N.E.3d at 650 (internal quotation marks omitted). Importantly, only after payment of the bonus would the arbitration clause apply. Therefore, although the arbitration clause applies to "[a]ny dispute that arises under this Lease," (R. 1-1) (Lease) (Page ID #26), it takes effect only after Rogers is "bound [by the Lease]"—after he is paid the bonus and the second phase of the Lease commences (R. 1-1) (Lease) (Page ID #19, 26).[2]

---

[2] Beyond Section 16's indication that Rogers was to be bound only "upon [Shell's] paying the full amount of the bonus payment," Section 33 provides further support for the conclusion that the arbitration clause applied only to disputes arising in the second phase of the Lease. It requires that "[e]ach arbitrator shall be an active or recently retired business person or professional with not less than ten years [sic] experience in exploration and production activities associated with the oil and gas industry. The arbitrators may engage engineers, accountants or other consultants that the arbitrator deems necessary to render a conclusion in the arbitration proceeding." R. 1-1 (Lease) (Page ID #33). The qualification requirements make sense if the arbitrators will decide disputes arising between Rogers and Shell after Shell paid the bonus, involving the actual extraction of natural resources from the leased land such as disputes related to the parties' "mutual[] agree[ment] in writing on the location of all wells, roads, pipelines, gates, and other equipment so as to minimize disruption of [Rogers's] use of the Leased Premises," (R. 1-1 (Lease

Shell argues that it is for the arbitrator to decide whether the condition precedent to arbitration (here, payment of the bonus) has been fulfilled. Appellant Br. at 17–18. However, that is the case only when the condition precedent is procedural and relates to "*when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all." *BG Group, PLC v. Republic of Arg.*, 572 U.S. 25, 35 (2014) (emphasis in original) (determining that an arbitrator was the proper body to decide whether the procedural condition precedent, eighteen months having elapsed since the dispute was submitted to a local tribunal, was satisfied). Such procedural conditions precedent "include claims of waiver, delay, or a like defense to arbitrability" and "the satisfaction of prerequisites such as time limits, notice, laches, [and] estoppel." *Id.* (internal quotation marks omitted); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–86 (2002) (holding that compliance with a time-limit on the initiation of arbitration was not a gateway "question of arbitrability" that was reserved for the courts as it was procedural rather than substantive). In contrast, the condition precedent here, payment of the bonus, is substantive rather than procedural. It *triggers* the duty to arbitrate disputes in the future relationship between the parties, thus determining "*whether* there is a contractual duty to arbitrate at all." *BG Group*, 572 U.S. at 35. The assessment of whether a substantive condition precedent has been satisfied is the realm of the court, not the arbitrator.[3] *Id.* at 34.

---

Article V, Section 28(Q)) (Page ID #25)), or whether Shell was using "reasonable care and reasonable safeguards to prevent its operation from [ ] causing or contributing to soil erosion" (R. 1-1 (Lease Article V, Section 28(B)(a)(i)) (Page ID #22)). Requiring arbitrators with such expertise would make little sense if they were to decide disputes about the parties' compliance with the first phase, which had little to do with the "exploration and production activities associated with the oil and gas industry."

[3] Relatedly, because the bonus payment was never made and the portion of the contract that included the arbitration clause was never triggered, the "presumption of arbitrability" never came into play. *AT&T Techs.*, 475 U.S. at 650. "[W]here the contract contains an arbitration clause . . . [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" and "[d]oubts should be resolved in favor of coverage." *Id.* (internal

The majority reads the same contract differently. It concludes that the Lease is not a phased agreement, and that the arbitration clause applies to disputes arising prior to Shell's payment of the bonus as well as after it.[4] This is an inferior reading of the contract for several reasons. First, the majority agrees with Shell that "[t]he first line of the agreement *defines* the term 'Lease' as the 'Oil and Gas Lease,'" a conclusion that contributes to its refusal to read the contract to describe a phased agreement. Majority Opinion at 2 (emphasis added). In fact, it does no such thing. The preamble to Article I begins "THIS OIL AND GAS LEASE (hereinafter, 'Lease') made and entered into this 22 day of Oct[ober], 2011 . . . ." R. 1-1 (Lease) (Page ID #16). The first line of the Lease merely substitutes the term "Lease" for the longer term "Oil and Gas Lease" for conciseness and ease throughout the contract, much as we often do in our opinions. In fact, there is a distinct section of Article I of the contract titled "Definitions," in which "Lease" does not appear as a term defined by the drafters.[5] R. 1-1 (Lease Article I, Section 7) (Page ID #18). The

---

quotation marks omitted) (first brackets in original). But because the condition precedent was never satisfied, the arbitration clause was never part of an effective contract and therefore no presumption of arbitrability applies.

[4] The majority's conclusion that the arbitration clause was triggered at signing leads it to apply the severability doctrine. *See Buckeye*, 546 U.S. at 445–46. Under Rogers's reading of the contract, however, because Shell never paid Rogers the bonus, the second phase of the agreement, to which the arbitration clause applied, was never triggered. This is not a situation in which the Supreme Court has declared that the severability doctrine applies. *See id*. at 444 & n. 1 (internal citations omitted) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today . . . does not speak to the issue decided in the cases cited by respondents . . . , which hold that it is for courts to decide whether the alleged obligor ever signed the contract . . . and whether the signor lacked the mental capacity to assent.") This distinguishes the dispute at hand from the kind discussed in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, which applied the severability doctrine to "a claim of fraud in the inducement of the entire contract," which necessarily requires that the parties have entered into the contract in the first place. 388 U.S. 395, 402–04 (1967). Rather, it is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide," meaning that severability does not apply. *Granite Rock*, 561 U.S. at 296.

[5] The drafters also specifically indicated when they meant to define a term in other sections of the Lease. In Article V, Section 28(M), for example, the contract provides that "[f]or purposes hereof, 'completion of operations' shall mean the completion of drilling operations as to equipment and facilities relating to drilling, including any associated pits, tanks . . . ." R. 1-1 (Lease) (Page ID #24). The drafters also knew how to define a term by reference. In Article V, Section 28(N), the contract notes that "Lessee shall not use, dispose of or release . . . any substances . . . which are defined as 'hazardous materials', 'toxic substances' or 'solid wastes' in federal, state or local laws, statutes or ordinances." *Id*.

majority overstates its conclusion that Lease was a "define[d]" term and the corresponding weight that it places on the arbitration clause's applicability to "[a]ny dispute that arises under this Lease." R. 1-1 (Lease) (Page ID #26).

Second, the majority inappropriately speculates about what was "[i]mportant to" the parties: "Important to Rogers, the agreement provides a signing bonus of $5,000 per acre" and "Important to Shell, the lease contains a broad arbitration clause, providing that any dispute under the lease be resolved by binding arbitration." Majority Opinion at 1. But how does the majority know that it was not "[i]mportant to Rogers" that should Shell fail to make its promised bonus payment, he be able to contest Shell's conduct without submitting to preclusively expensive arbitration and thus insisted that he not be "bound" by the Lease until Shell had paid "the full amount of the bonus payment"?[6] R. 1-1 (Lease) (Page ID #19). We "give effect to the intent of the parties," (*Transtar*, 16 N.E.3d at 648), not by speculating as to their intent and then reading the contract selectively to support our assumptions, but rather by "examin[ing] the contract as a whole and presum[ing] that the intent of the parties is reflected in the language of the contract" (*Sunoco*, 953 N.E.2d at 292). The majority's speculation into what was "[i]mportant to" each party may influence the majority to read out language to conclude that the arbitration clause applies universally.

Third, the majority ignores the contract's contradictory assertions of when the Lease becomes effective—the same contract provides both that the Lease "shall become effective" on the date that Rogers signed (October 22, 2011) and "tak[es] effect [ ] upon [Rogers's] receipt of

---

[6] Counsel for Shell reminded us at oral argument that we were not to be swayed by a suspicion that Shell, a corporate behemoth, had unilaterally written and imposed its contract terms on a less sophisticated Rogers because said contract contains Article VII, Section 39, which provides: "For the purpose of construction, interpretation, arbitration or adjudication, it shall be deemed that Lessee and Lessor contributed equally to the drafting of this instrument." R. 1-1 (Lease) (Page ID #28). Accordingly, we cannot read out language that is favorable to Rogers's position by assuming that including it was not his primary goal in contracting with Shell.

the bonus payment," a date that never materialized. R. 1-1 (Lease) (Page ID #18, 22). The majority reads out the entire second specification for when the Lease "tak[es] effect," allowing for an interpretation completely contrary to it. *Id.* The majority's interpretation also fails to account for Article III, Section 16's language providing that Rogers was to be "bound" by the lease only "upon Shell's paying the full amount of the bonus payment." R. 1-1 (Lease) (Page ID #19). That is not the way that we read contracts. *Sunoco*, 953 N.E.2d at 295 ("In interpreting a contract, we are required, if possible, to give effect to every provision of the contract. If one construction of a doubtful condition written in a contract would render a clause meaningless and it is possible that another construction would give that same clause meaning and purpose, then the latter construction must prevail." (brackets and quotation marks omitted)).

At the "who decides" stage of the analysis, however, the question that matters is not whether my interpretation of the applicability of the arbitration clause or the majority's is *correct*. It is only whether it is "*clear and unmistakable*" that "the parties agreed to arbitrate arbitrability." *First Options of Chi.*, 514 U.S. at 944 (quoting *AT&T Techs.*, 475 U.S. at 649) (brackets omitted) (emphasis added). Given the contract's conflicting language and my considerably different interpretation of the contract from that of the majority, I do not believe that it is. Therefore, the court, not the arbitrator, is the proper body to decide whether the dispute is arbitrable.

Although the district court failed to answer the preliminary question of who decides the question of arbitrability, it did answer the subsequent question of whether the dispute is arbitrable. Although my thoughts on that question are necessarily developed in the above analysis, as the majority has limited itself to the first question of who decides arbitrability, I likewise refrain from deciding it here. I otherwise concur in the majority's decision to remand to the district court for it to decide the class arbitration issue in the first instance.